# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID LAWERANCE ROBINSON, | 3:18-cv-01605 (KAD) |
| *Plaintiff*, | |
| v. | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY,[1] | February 11, 2020 |
| *Defendant*. | |

## MEMORANDUM OF DECISION RE:
## PLAINTIFF'S MOTION TO REVERSE DECISION OF THE COMMISSIONER AND/OR TO REMAND TO THE COMMISSIONER (ECF NO. 13) AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (ECF NO. 14)

Kari A. Dooley, United States District Judge:

David Lawerance Robinson (the "Plaintiff") brings this administrative appeal pursuant to 42 U.S.C. § 405(g). He appeals the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying his application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). Plaintiff moves to reverse the Commissioner's decision or, in the alternative, to remand the case to the agency based on: (1) the alleged failure of the Administrative Law Judge ("ALJ") to analyze whether the Plaintiff's severe impairments met or medically equaled a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P, specifically with respect to a "closed period" of time during which Plaintiff underwent three separate surgeries; (2) certain alleged errors committed by

[1] Plaintiff commenced this action against Nancy A. Berryhill as the Acting Commissioner of Social Security on September 24, 2018. (ECF No. 1.) Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Commissioner Saul is automatically substituted for Nancy A. Berryhill as the named defendant. The Clerk of the Court is requested to amend the caption in this case accordingly.

the ALJ which resulted in the ALJ improperly rendering his own medical judgments and incorrectly formulating the Plaintiff's residual functional capacity; (3) the ALJ's alleged violation of the "treating physician rule;" and (4) the ALJ's alleged failure to consider all of the Plaintiff's limitations in the ALJ's determination of the Plaintiff's residual functional capacity. The Commissioner opposes each of these claims of error and moves for judgment on the pleadings affirming its decision. For the reasons set forth below, the Plaintiff's motion to reverse and/or remand is GRANTED, the Commissioner's motion for judgment on the pleadings is DENIED, and the case is remanded to the ALJ principally for the ALJ to revisit certain evidence that he appears to have overlooked in formulating the Plaintiff's residual functional capacity, for the ALJ to obtain updated medical opinion evidence, and for the ALJ to reconsider whether Plaintiff may have been disabled for a "closed period" of one year or more that includes the nine-month period of time during which Plaintiff underwent three back surgeries.

**Standard of Review**

A person is "disabled" under the Act if that person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). In addition, a claimant must establish that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months"; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *Id.* §§ 404.1520 (a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

It is well-settled that a district court will reverse the decision of the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*) (quotation marks and citation omitted). Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian,* 708 F.3d at 417.

**Background and Procedural History**

On March 5, 2015, Plaintiff filed an application for DIB pursuant to Title II of the Act. Plaintiff initially alleged an onset date of October 27, 2013 (Tr. 186), which was based upon the date that he was involved in a motor vehicle accident, but he later amended his onset date to July 1, 2014, which was the date that Plaintiff stopped working. (*See* Tr. 35–36.) Following that motor vehicle accident, Plaintiff visited the Emergency Room at the Hospital of Central Connecticut with complaints of back pain. (Stipulation of Medical Facts, hereafter "Stip.," at 1, ECF No. 13-2.) In the months that followed, Plaintiff's physician, Dr. Tracy Gulling, reported that Plaintiff's pain was severe and increasing and that he completed physical therapy without success. (*Id.* at 1–2.)

On April 29, 2014, an MRI was ordered, which "revealed a mild disc bulge and posterior annular tear at L3-LR, and that, at L5-S1, there was a small central and right paramidline disc protrusion extending to the right lateral recess and proximal neural foramen, with an impression on the right S1 nerve root in the lateral recess." (*Id.* at 2.) Plaintiff underwent a laminectomy with foraminotomy at L5-S1 on July 2, 2014, and was diagnosed with "disk herniation, L5-S1, foraminal stenosis, and facet hypertrophy." (*Id.*) On September 17, 2014, Plaintiff underwent a second surgery—"a revision laminectomy, foraminotomy, and resection of recurrent disk herniation," and was diagnosed with "severe lumbar radiculopathy secondary to herniated nucleus pulposus (HNP) L5-S1 on the right." (*Id.* at 3.)

Following the two surgeries, Plaintiff undertook a three-month course of physical therapy. (*Id.*) His discharge summary of January 16, 2015 "noted 60-65% improvement but that progress had reached a plateau, that claimant used a cane for community ambulating, had a decreased tolerance for sitting, and had sought care from another doctor for pain management." (*Id.* at 4.) Dr. Lucien Parrillo, whom the Plaintiff saw for pain management, administered medial branch block injections over L4 and L5 on December 30, 2014, but they provided only minimal relief. (*Id.* at 5.) Dr. Parrillo noted that Plaintiff's "activity levels were slowly declining due to pain and weakness" and an MRI administered on March 11, 2015 "revealed status post right hemilaminectomy with no recurrent protrusion." (*Id.*) Plaintiff underwent another surgery on April 16, 2015 based upon a showing of "end-stage disk disease with disk collapse and severe foraminal stenosis large recurrence with both foraminal and paramedian disk protrusion and herniation and formation of osteophytes," and "failed advanced conservative therapy." (*Id.* at 5–6.) This procedure consisted of a circumferential fusion, an anterior diskectomy and fusion at L5-S1, and a posterior fusion at L5-S1. (*Id.* at 6.)

From June 10, 2015 to August 4, 2015, Plaintiff underwent another course of physical therapy and reports from Plaintiff's treatment providers around this time reflect both his experiences of ongoing pain as well as slow improvements in his condition. (*Id.* at 6–7.) On October 8, 2015, an MRI "revealed status post L5-S1 discectomy, anterior fusion, posterior fusion with metallic hardware in place, and trace retrolisthesis at L3-4 with minimal end plate spurring and slight annular disc bulge with minimal narrowing of the canal." (*Id.* at 7.) Dr. Joseph Aferzon, who performed all of Plaintiff's surgeries, noted on October 20, 2015 that Plaintiff "still had lower extremity weakness and used a cane, and noted early bridging and evolving fusion." (*Id.*) On January 14, 2016, Dr. Jeffrey Bash, who performed Plaintiff's third surgery with Dr. Aferzon, was consulted. "He found positive bilaterally straight leg raising," "diagnosed retrolisthesis L3 upon L4, lumbar pain and lumbar radicular syndrome," and recommended, *inter alia*, a potential disc replacement and a "lumbar epidural steroidal injection by Dr. Parrillo." (*Id.* at 8.) On February 4, 2016, Dr. Parrillo administered bilateral transforaminal injections and five days later Dr. John Fulkerson, an orthopedic physician, prescribed Plaintiff braces to support the weakness in his lower extremities. (*Id.*) Plaintiff subsequently underwent a neuromodulation trial and enrolled in a medical marijuana program, which Dr. Parrillo noted on June 20, 2016 "seemed to be helping his overall pain." (*Id.* at 9.) On December 29, 2016, Plaintiff underwent a spinal cord stimulator trial which appeared to last five days. (*Id.*) On January 23, 2017, an MRI "revealed status post laminectomy and fusion, with no evidence of focal disc protrusion or other abnormality, and a tiny central disc protrusion with annular tear and no neural compromise at L3-4." (*Id.*)

On March 28, 2017, Dr. Parrillo completed a Medical Source Statement for Plaintiff's DIB application in which "[h]e assessed post-laminectomy syndrome, lumbar spine, with guarded to poor prognosis, and with symptoms including chronic low back pain and bilateral leg weakness

and numbness." (*Id.* at 10.) In an eight-hour workday, Dr. Parrillo estimated that Plaintiff could stand or walk for less than two hours and sit for about two hours, with a need for hourly adjustments and unscheduled breaks three to four times per day. (*Id.*) He advised that Plaintiff use a cane when standing or walking "due to imbalance, insecurity, pain, and weakness." (*Id.*) Dr. Parrillo wrote that "Mr. Robinson has been totally disabled since his first surgery on 7-20-14 [sic], due to post-lami syndrome, bilat. Osteoarthritis of knees & myofascial pain syndrome requiring surgical intervention." (*Id.* at 11.)

Plaintiff's claim for DIB was initially denied on July 14, 2015 and upon reconsideration on December 10, 2015. Thereafter, a hearing was held before an ALJ on March 29, 2017. On June 27, 2017, the ALJ issued a written decision denying Plaintiff's application.

In his decision, the ALJ followed the sequential evaluation process for assessing disability claims. At Step One, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since the alleged onset date of July 1, 2014. (Tr. 15.) At Step Two, the ALJ determined that Plaintiff had medically determinable severe impairments consisting of: (1) post-laminectomy syndrome of the lumbar spine with spondylosis and radiculitis; (2) myofascial pain syndrome; (3) degenerative joint disease in the bilateral knees; and (4) obesity. (Tr. 15.) The ALJ also found that Plaintiff had a non-severe impairment in the form of obstructive sleep apnea. (Tr. 15–16.) At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination thereof that meets or medically equals the severity of a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Tr. 16.) At Step Four, the ALJ concluded that Plaintiff has the RFC to perform sedentary work except that "he could only occasionally climb ramps and stairs, never climb ladders, ropes or scaffolding, and could occasionally balance, stoop, kneel, crouch and crawl," and he could additionally "tolerate no concentrated exposure to vibration and no exposure to

unprotected hazards such as machinery and heights." (Tr. 16.)  The ALJ further found that Plaintiff

does not have the RFC to perform his past relevant work as a director of food operations, kitchen

manager, or cook.  (Tr. 22.)  Finally, at Step Five, the ALJ concluded that there are a significant

number of jobs in the national economy that Plaintiff could perform, such as a surveillance system

monitor, fund raiser, and credit card clerk.  (Tr. 23.)  Accordingly, the ALJ found that Plaintiff

was not disabled within the meaning of the Act.

On August 22, 2018, the Appeals Council denied Plaintiff's request for review, thereby

rendering final the ALJ's decision.  This appeal followed.

## Discussion

Plaintiff sets forth four bases upon which the Commissioner's decision should be reversed.

He first asserts that the ALJ failed to determine whether his severe impairments meet or medically

equal a listing under the applicable regulations—specifically with respect to a "closed period" of

at least 12 months encompassing Plaintiff's series of surgeries.  He next asserts that the ALJ

improperly overlooked or "cherry picked" certain evidence to suit his own interpretation, thereby

incorrectly formulating Plaintiff's RFC.  Third, Plaintiff argues that the ALJ violated the "treating

physician rule" by assigning great weight to the opinions of non-examining physicians and only

partial weight to that of Plaintiff's treating pain management physician, Dr. Parrillo.  Lastly,

Plaintiff submits that the ALJ incorrectly formulated Plaintiff's RFC by failing to include all of

the Plaintiff's limitations.  These issues are addressed *seriatim*.

### Whether Substantial Evidence Supports the ALJ's Determination that Plaintiff's Medically Determinable Impairments Did Not Meet or Equal a Listing

#### *Plaintiff's Lumbar Spine Impairment*

The ALJ evaluated the Plaintiff's lumbar impairment under Listing 1.04, which

encompasses "[d]isorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal

cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.[2]  As relevant here, to satisfy this listing the impairment must be accompanied by:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or …

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*

The ALJ concluded that the Plaintiff's lumbar spine impairment did not satisfy this listing because "[t]he most recent imaging of the claimant's lumbar spine does not demonstrate any abnormalities causing stenosis or nerve root impingement or encroachment" and because "findings on physical and neurological examination does [sic] not demonstrate regular findings of positive straight leg raise testing, muscle weakness or motor loss in his lower extremities, or observation of the claimant's gait demonstrating an [in]ability to ambulate effectively as defined in 1.00B2b." (Tr. 16.)   Breaking down these conclusions as they apply to the respective sub-listing criteria, if the ALJ is correct that the medical record provides insufficient evidence of nerve root compression, sensory or reflex loss, and positive straight leg testing, then Plaintiff's lumbar impairment could not satisfy the criteria in Listing 1.04A.  *See Marchetti v. Colvin*, No. 13-CV-02581 (KAM), 2014 WL 7359158, at *10 (E.D.N.Y. Dec. 24, 2014) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (quoting *Sullivan v. Zebley*,

[2] Although the Listings have been amended since the ALJ issued his decision, these amendments do not bear on the issues raised by the Plaintiff's motion or on the Court's analysis.  The Court therefore cites to the current iteration of the Listings throughout this Memorandum of Decision.

493 U.S. 521, 530 (1991)); *accord Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *3 (D. Conn. Dec. 21, 2017).  And if the ALJ is correct that the medical record lacks sufficient evidence of lumbar spinal stenosis causing chronic weakness and nonradicular pain and resulting in Plaintiff's inability to ambulate effectively, then Plaintiff's impairment could not satisfy the criteria in Listing 1.04C.  The Court addresses the medical evidence concerning each of these sub-listings in turn.

With respect to the Listing 1.04A criteria, although the evidence is mixed, substantial evidence supports the ALJ's determination that the more recent medical evidence following Plaintiff's fusion surgery in April 2015 did not reveal any nerve root impingement or compression as required by this listing.  (*See* Tr. 807 (October 2015 report from Dr. Aferzon noting that Plaintiff's CT scan showed "[e]arly bridging with evolving fusion" and "[o]verall looks good"); Tr. 897 (January 2017 MRI noting the absence of "neural compromise" post-fusion surgery).) However, for many months prior to Plaintiff's fusion surgery, the record does reveal nerve root impingement.  Indeed, nerve compression or impingement appeared to constitute one of Plaintiff's major aggravating conditions during this time period.  (*See, e.g.*, Tr. 510–11 (MRI from April 29, 2014 noting that at L5-S1, "[t]here is impression upon and displacement of the right S1 nerve root"); Tr. 347 (Dr. Aferzon's discharge summary from July 3, 2014, following Plaintiff first surgery, attributing MRI that "showed a disk herniation with impingement on the exiting right S1 nerve root" as one of the reasons for the procedure); Tr. 499–500 (MRI from August 28, 2014 noting that "[p]reviously seen herniated disc has decreased slightly, though a moderate component of disc protrusion remains or has recurred.").)  Indeed, Dr. Aferzon's discharge notes following Plaintiff's fusion surgery list as one of his diagnoses "neural compression," in addition to

"[s]coliosis and advanced disk disease, discogenic pain," and "recurrent disk herniation." (Tr. 615.)

Plaintiff therefore argues that the ALJ erred by failing to consider whether Plaintiff's impairments met or equaled a Listing during a "closed period" of one year or more including the time period during which Plaintiff underwent his three surgeries. *See, e.g.*, *Carbone v. Astrue*, No. 08-CV-2376 (NGG), 2010 WL 3398960, at *13 n.12 (E.D.N.Y. Aug. 26, 2010) ("A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status.") (quotation marks and citation omitted). However, this argument fails because there is substantial evidence in the record to support the ALJ's additional determination that Plaintiff's impairment during this closed period was not "accompanied by sensory or reflex loss," as also required by the Listing 1.04A criteria. Specifically, the ALJ noted that "[e]xamination has continued to reveal areas of tenderness in his lumbar spine, but typically normal range of motion in [the Plaintiff's] lumber spine and bilateral extremities." (Tr. 19.) The ALJ additionally noted that "[n]eurological examination showed the claimant to possess generally intact reflexes, sensation and strength in his bilateral lower extremities, with no significant findings of instability . . . ." (Tr. 19.) These observations are supported by the record evidence. (*E.g.*, Tr. 319, 322, 326, 749, 763, 787.) Therefore, the ALJ's failure to consider whether the Plaintiff's nerve impingement was present for a closed period was harmless error. *See, e.g.*, *Whitley v. Colvin*, No. 3:17-CV-00121 (SALM), 2018 WL 1026849, at *14 (D. Conn. Feb. 23, 2018) ("Administrative legal error is harmless when the same result would have been reached had the error not occurred.")

(quotation marks, citation, and alterations omitted).[3]  As a result, no remand is required on the issue of whether Plaintiff's lumbar spine impairment met the Listing at 1.04A even for a closed period.[4]

With respect to the Listing 1.04C criteria, although there are some indicia of a lumbar spinal stenosis diagnosis, substantial evidence supports the ALJ's determination that Plaintiff frequently exhibited a normal gait and did not demonstrate an inability to ambulate effectively as required by Listing 1.04C.  (*See, e.g.*, Tr. 322, 326, 341, 505, 749, 763.)  The "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b(1).  While the record does indicate that Plaintiff used a single cane at times to assist with walking (*see e.g.*, Tr. 408, 432, 460, 482, 492, 584), the regulations require that the claimant be unable to ambulate independently "without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities" to satisfy this criterion.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00.B2b(1) (emphasis added); *see also id.* § 1.00.B2b(2) (providing, as "examples of ineffective ambulation," *inter alia*, "the inability to walk without the use of a walker, two crutches or two canes").  The fact that Plaintiff sometimes used a single cane to assist with walking therefore does not undermine the ALJ's finding and the ALJ need not revisit this issue on remand.

---

[3] The listing requirements aside, and as discussed *infra*, the Court agrees that the ALJ's failure to consider whether Plaintiff was disabled for a closed period when assessing his RFC warrants a remand.

[4] The ALJ also cited Plaintiff's "typically negative findings on straight leg raise testing." (Tr. 19.)  While the evidence of Plaintiff's straight leg raising tests, also relevant to Listing 1.04A, is somewhat mixed (*compare* Tr. 319, 322, 749, 763, 787, 795, 894, 907 (reports of negative straight leg testing) *with* Tr. 410, 434, 462, 484, 549, 882 (reports of positive straight leg testing)), the Court must "defer to the Commissioner's resolution of conflicting evidence," *Cage*, 692 F.3d at 122.  The evidence of positive straight leg testing is not so overwhelming that "a reasonable factfinder would *have to conclude otherwise*," *Brault*, 683 F.3d at 448, and so the Court accordingly defers to the ALJ's ruling with respect to this aspect of Listing 1.04A.

### *Plaintiff's Bilateral Knee Impairments*

The ALJ evaluated the Plaintiff's bilateral knee impairments under Listing 1.02, which encompasses "[m]ajor dysfunction of a joint(s) (due to any cause)" and which is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. As relevant here, the joint dysfunction must also be accompanied by "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id.* § 1.02(A). Citing Plaintiff's "gait and neurological findings on testing of his lower extremities," the ALJ determined "that the record does not show that these impairments cause him an inability to ambulate effectively as defined in 1.00B2b" and therefore concluded that Plaintiff's knee impairments did not satisfy Listing 1.02(A). (Tr. 16.) As noted previously, the ALJ's conclusion in this regard is supported by substantial evidence in the medical record.

### *Obesity*

The regulations do not include a listing for obesity but, rather, contemplate "the consideration of the effect of obesity as a factor, which may increase the severity of coexisting or related impairments." (Tr. 16.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00Q. On this issue the ALJ determined that "the record does not contain an indication that the cumulative effect of claimant's obesity so significantly affects his other impairments as to meet or medically equal a listing." (Tr. 16.) The Court has not uncovered, and the Plaintiff has not identified, any record evidence that would undermine this conclusion and so the Court does not disturb it.

### *Whether Plaintiff's Impairments Otherwise Medically Equaled a Listing*

While Plaintiff argues that "[t]he ALJ made no finding regarding whether listing 1.04 or 1.02(A), either separately or together, medically equaled a listing," (Pl.'s Mem. at 5), the above analysis confirms that the ALJ did, in fact, assess whether Plaintiff's impairments satisfied the criteria embodied in Listings 1.04 and 1.02(A). As noted previously, a claimant's impairment must satisfy *all* of a listing's criteria to qualify, *see, e.g.*, *Marchetti*, 2014 WL 7359158, at *10, and the ALJ clearly concluded that they did not. Plaintiff also argues that the ALJ was required to consider whether Plaintiff's impairments were medically equivalent to some other listing, as set forth in Listing 1.004H4. That listing provides in relevant part that "in any case in which an individual has a medically determinable impairment that is not listed, an impairment that does not meet the requirements of a listing, or a combination of impairments no one of which meets the requirements of a listing, we will consider medical equivalence." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00H4. A claimant's impairment(s) is medically equivalent to a Listing, according to the regulations, "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). While Plaintiff is correct that the ALJ did not appear to consider whether Plaintiff's impairments were medically equal to those of another listed impairment, he fails to identify the relevant findings that the ALJ neglected to consider or another analogous impairment for which he believes medical equivalence could have been established.[5]

---

[5] The ALJ did not specifically address at Step Three Plaintiff's myofascial pain syndrome, which the ALJ identified as a medically determinable impairment. However, "the listing of musculoskeletal impairments does not include general myofascial pain and provides that the pain be coupled with limitation in motion." *Feliciano v. Barnhart*, No. 04-CV-9554 (KMW) (AJP), 2005 WL 1693835, at *14 (S.D.N.Y. July 21, 2005) (Report and Recommendation) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02). The ALJ's determinations regarding Plaintiff's ability to ambulate effectively would therefore seem to obviate a finding that Plaintiff's myofascial pain syndrome could meet the criteria set forth in Listing 1.02. *See id.* (concluding that ALJ's finding that the plaintiff's myofascial pain syndrome did not meet the level of severity required by the Listings was supported by substantial evidence in light of physicians' reports indicating plaintiff was not limited in her mobility and ambulation). Plaintiff's motion does not assert any discrete error with respect to the ALJ's findings regarding his myofascial pain syndrome.

Instead Plaintiff argues that the ALJ was obligated to receive as evidence "the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence." (Pl.'s Mem. at 6 (quoting Social Security Ruling ("SSR") 96-6P).) However the Ruling that the Plaintiff cites provides further:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, . . . may also ensure that this opinion has been obtained at the first two levels of administrative review.
>
> When an administrative law judge or the Appeals Council finds that an individual[']s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record **may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant**.

SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996) (emphasis added). One court in this District has acknowledged a split among some courts outside of this Circuit as to whether signatures on the requisite disability forms alone satisfy the requirement that the Commissioner consider medical equivalence if the state consultants did "not explicitly address equivalence." *See Howarth*, 2017 WL 6527432, at *10. The court ultimately did not reach the issue in light of its decision to remand on other grounds. *See id.* However, a more recent decision in this Circuit determined that where the record "contain[ed] a Disability Determination Form completed and signed by a designated psychological consultant," this reflected that "the question of medical equivalence was considered and appropriately rejected," consistent with SSR 96-6P. *Jusino v. Berryhill*, No. 17-CV-4553 (GBD) (HBP), 2018 WL 3628901, at *4 (S.D.N.Y. July 30, 2018). The Court agrees with this conclusion, which tracks the clear language of SSR 96-6P highlighted above. The Court therefore finds that the ALJ's receipt of opinion evidence from two physicians—Drs. Jeanne Kuslis and Khurshid Khan, who considered whether Plaintiff's impairment met Listing 1.04, and who signed

the accompanying Disability Determination and Transmittal Forms, (Tr. 76, 82, 88, 94) satisfied the ALJ's obligation on the issue of medical equivalence.[6]

### Whether the ALJ Erred in Formulating Plaintiff's RFC

#### *The ALJ's Failure to Consider Whether Plaintiff Was Disabled for a Closed Period*

As an initial matter, while the Court concluded above that the ALJ's failure to determine whether Plaintiff's impairments met or equaled a listing for a closed period was harmless error, the same cannot be said with respect to the ALJ's failure to determine whether Plaintiff's RFC rendered him disabled for a closed period. Plaintiff underwent three surgeries in a period of nine months during which he experienced recurring symptoms of nerve compression, as discussed above, and the last of Plaintiff's surgeries was followed by three months of physical therapy. Yet the ALJ did not appear to consider whether, notwithstanding Plaintiff's subsequent improvements, he may have been disabled for a closed period of one year or more. Instead, the ALJ appears to have discounted certain evidence of Plaintiff's physical limitations because it predated his third surgery, such as the observation of Plaintiff's physical therapist, Alyssa Pastuszak, who stated that Plaintiff "is significantly limited with functional activities including sitting, standing, walking, bending, carrying and lifting," and "requires seated rest breaks for prolonged standing, but can only tolerate standing for 10-15 minutes." (Tr. 584; *see* Tr. 21.) This constitutes an error warranting remand. *See, e.g.*, *Smith v. Berryhill*, No. 17-CV-05639 (PAE) (SN), 2018 WL 4565144 (S.D.N.Y. Sept. 24, 2018) (adopting Report and Recommendation) ("direct[ing] the ALJ

---

[6] In addition, SSR 96-6P was replaced by SSR 17-2P effective March 27, 2017, two days before Plaintiff's hearing date. The now-applicable SSR clarifies that "[i]f an adjudicator at the hearings or [Appeals Council] level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, *we do not require the adjudicator to obtain [medical expert] evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment*." SSR 17-2P, 2017 WL 3928306, at *4 (March 27, 2017) (emphasis added). Under either version of the ruling, therefore, the Court discerns no legal error in the ALJ's consideration of medical equivalence.

on remand to consider expressly whether, notwithstanding certain evidence tending to suggest improvement in her condition, [the plaintiff] was disabled for any period of time greater than 12 months following the onset of her disability" where it was unclear from the record whether "the ALJ considered a closed period of disability at all").[7]

### Other Errors That Bear on Plaintiff's RFC

The ALJ also appears to have overlooked certain evidence that warrants reconsideration of Plaintiff's RFC not only with respect to a closed period but beyond that period. For example, the ALJ stated that, "[i]n general, the claimant has received conservative treatment for his ongoing low back pain following his fusion surgery . . . ." (Tr. 19.) The ALJ also noted that following Plaintiff's third surgery he continued to receive treatment from Drs. Aferzon and Parrillo and that "[a]dditional physical therapy, injections in his lumbar spine, and a possible L3-L4 disc replacement surgery was also discussed, but there is no indication that these treatment methods were pursued." (Tr. 19.) This finding is not supported by the record. The January 2016 report from Dr. Bash cited by the ALJ in support of this proposition states that Plaintiff "is currently involved in physical therapy at Hospital for Special Care in New Britain" (Tr. 882)—thus calling into question the ALJ's observation of "no record of ongoing therapy following August of 2015."[8] (Tr. 18.) And contrary to the ALJ's depiction, Plaintiff did undergo bilateral epidural steroid

---

[7] The ALJ did correctly observe that "Ms. Pastuszak is not an acceptable medical source." (Tr. 21.) *See, e.g.*, *Parsons v. Berryhill*, No. 3:17-CV-1550 (RMS), 2019 WL 1199392, at *9 (D. Conn. Mar. 14, 2019). While this means that her opinions "cannot be assigned controlling weight," *see id.*, "a physical therapist is an 'other source' whose opinion the ALJ may consider regarding the severity of a claimant's impairment and how it affects the claimant's ability to work," *Gustafson v. Berryhill*, No. 3:18-CV-1026 (MPS), 2019 WL 4744822, at *8 (D. Conn. Sept. 30, 2019) (quotation marks, alterations, and citation omitted).

[8] At his hearing Plaintiff testified that he maintained a membership at the Hospital for Special Care that essentially enabled him to manage his own physical therapy and estimated that the last time he saw a physical therapist was in March 2016. (Tr. 41–43.) If Plaintiff in fact attended formal physical therapy from August 2015 to approximately March of 2016, as suggested by his testimony, then the ALJ on remand should request the relevant records from that timeframe. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) "[T]he ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel.") (quotation marks and citations omitted).

injections in February of 2016.  (Tr. 911–12; *see also* Stip. at 8.)  On April 12, 2016, a treatment

note from Dr. Parrillo also indicates that Plaintiff was enrolled in a medical marijuana program

and that "[h]e recently underwent a neuromodulation trial with St. Jude," (Tr. 909) And on

December 29, 2016, two spinal cord stimulators were inserted into the Plaintiff's spine.  (Tr. 902–

04.)  There is also evidence indicating that Plaintiff was taking morphine and hydromorphone to

manage his pain well beyond the aftermath of his fusion surgery.  (*e.g.*, Tr. 785, 905.)  As such,

the ALJ's depiction of, and reliance on, the Plaintiff's treatment following his third surgery as

being "conservative" is inapt.  *See Jazina v. Berryhill*, No. 3:16-CV-01470 (JAM), 2017 WL

6453400, at *6 (D. Conn. Dec. 13, 2017) (finding that the "plaintiff's treatment regimen—which

included powerful prescription opioids like oxycodone as well as other prescription drugs, and in

the past included physical therapy and injections—does not appear to qualify as conservative").

This also constitutes grounds for remand.  *See Rodriguez v. Colvin*, No. 13-CV-1195 (DFM), 2016

WL 3023972, at *2 (D. Conn. May 25, 2016) ("It is grounds for remand for the ALJ to ignore parts

of the record that are probative of the claimant's disability claim.") (quoting *Sutherland v.

Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004)).

Plaintiff also points to some apparent inconsistencies in the ALJ's determinations, such as

his observation that "findings on physical and neurological examination following [Plaintiff's]

fusion surgery demonstrate ongoing abnormalities on physical examination, but generally intact

findings on neurological examination in his lumbar spine and bilateral lower extremities."  (Tr.

19.)  As indicated previously, much of the evidence generally supports the ALJ's observation that

"[n]eurological examination showed the claimant to possess generally intact reflexes, sensation

and strength in his bilateral lower extremities, with no significant findings of instability, and

typically negative findings on straight leg raising."  (*See, e.g.*, Tr. 322, 787, 905, 907.).  As also

noted previously, however, the record does indicate some recurring evidence of positive straight leg raising, and Drs. Aferzon and Bash also noted that Plaintiff continued to experience lower extremity weakness and neurogenic symptoms following his fusion surgery. (Tr. 807, 809, 882.) In light of the errors previously identified, on remand the ALJ should reconcile his findings regarding Plaintiff's physical and neurological condition against the totality of the evidence concerning Plaintiff's limitations—both within and outside of the potential closed period of disability.

### Whether the ALJ Properly Applied the "Treating Physician Rule" in Assessing Plaintiff's RFC

The applicable version of the regulation from which the so-called "treating physician rule" derives required the ALJ to confer "controlling weight" on medical opinions from Plaintiff's "treating sources," so long as those opinions "on the issue(s) of the nature and severity of [Plaintiff's] impairment(s) [are] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[9] "Treating source" is defined as an "acceptable medical source" who has provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the Plaintiff.]" *Id.* § 404.1527(a)(2). *See also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) ("[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," except where "the treating physician issued opinions that are not consistent with other

---

[9] On January 18, 2017, the Social Security Administration promulgated final rules that significantly change the way the Commissioner considers medical opinion evidence and that were made effective March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulation, 20 C.F.R. § 404.1520c, applies only to claims filed on or after March 27, 2017. Accordingly, because the Plaintiff's claims were filed before this date, this court applies the regulations in effect prior to March 27, 2017.

substantial evidence in the record, such as the opinions of other medical experts.") (citation omitted).

"If a treating source's opinion is <u>not</u> given controlling weight, 'SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive.'" *Consiglio v. Berryhill*, No. 3:17-CV-00346 (SALM), 2018 WL 1046315, at *4 (D. Conn. Feb. 26, 2018) (quoting *Greek*, 802 F.3d at 375). "To override the opinion of the treating physician, . . . the ALJ must explicitly consider, <u>inter alia</u>: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Id.* (quoting *Greek*, 802 F 3.d at 385).

"The Second Circuit has recognized that '[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source.'" *Worthy v. Berryhill*, No. 3:15-CV-1762 (SRU), 2017 WL 1138128, at *6 (D. Conn. Mar. 27, 2017) (quoting *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993)). However, "the ALJ is entitled to give the opinions of non-examining sources more weight than those of treating or examining sources where there is record evidence to support such a determination." *West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019); *see also Worthy*, 2017 WL 1138128, at *6 ("Social Security regulations . . . 'permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record.'") (quoting *Schisler*, 3 F.3d at 568). "Nonetheless, the ALJ may not credit a non-examining physician's opinion over that of a treating physician's where the non-examining physician's opinion considered less than the full record and the subsequent medical evidence may have altered the opinion." *West*, 2019 WL 211138, at *5.

The ALJ afforded "great weight" to the opinions of Drs. Jeanne Kuslis and Khurshid Khan, the State Agency medical consultants, even though he acknowledged that "they are non-examining and non-treating sources." (Tr. 21–22.) Both physicians indicated that Plaintiff's "[l]imitations are more severe than supported by the objective findings." (Tr. 77, 89.) Both opined, *inter alia*, that Plaintiff could stand and/or walk with normal breaks for a total of two hours per day, sit with normal breaks for a total of approximately six hours in an eight-hour workday, occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes or scaffolds. (Tr. 77–78, 89–90.) In rendering their opinions, both physicians cited the absence of "evidence of recurrent disc and patent neuroforaminal canals" in Plaintiff's March 2015 MRI, the fact that Plaintiff was managing his pain with narcotics, evidence of a full range of motion in his spine and the absence of spinal tenderness or muscular tenderness in the paraspinal and quadratus areas, his normal gait, and his negative straight leg raising and normal deep tendon reflex tests. (Tr. 79, 91.)

Dr. Kuslis's opinion was submitted on July 14, 2015—approximately three months after Plaintiff's fusion surgery (Tr. 79), and therefore did not consider the approximately year and a half of subsequent records that were before the ALJ. Dr. Khan's opinion was tendered on December 10, 2015 (Tr. 91) and did not consider more than a year of records that followed. This means that neither physician reviewed Dr. Parrillo's treatment records which reflected the epidural steroid injections in February 2016 (Tr. 911) and the spinal cord stimulator trial in December 2016. (Tr. 902.) Nor were Drs. Kuslis and Khan able to consider Dr. Bash's seemingly mixed prognosis in January 2016 (Tr. 882) or that Plaintiff was given a prescription for braces in February 2016 by

Dr. Fulkerson to support the weakness in his lower extremities. (Tr. 879.) These are all records which potentially bear on Plaintiff's exertional limitations.

Moreover, the evaluations completed by Drs. Kuslis and Khan both noted the absence of any other medical opinion evidence for them to weigh (Tr. 77, 91), as both preceded the evaluation proffered by Dr. Parrillo on March 28, 2017. (Tr. 892.) Thus while both physicians rated Plaintiff's "maximum sustained work capability" at the sedentary level, *i.e.*, the lowest exertional level (Tr. 80, 92), neither had the opportunity to reconcile the subsequent opinion of the Plaintiff's treating physician that he was, in fact, unable to perform even sedentary work. In Dr. Parrillo's medical source statement he opined, *inter alia*, that Plaintiff: was limited "to walking a half block, sitting for thirty minutes and standing for fifteen minutes at one time"; "could only stand and walk a total of less than two hours, and could only sit for a total of two hours out of an eight-hour day"; "would need to change positions and would require additional, unscheduled breaks during a working day"; "required a cane to ambulate due to symptoms of imbalance, pain, weakness and insecurity"; and "could only rarely lift up to ten pounds, never perform any postural activities, would be off-task at least 25% of a day, and would be absent about four days per month due to his impairment." (Tr. 21; *see* Tr. 889–92.) Given that these were the only three medical opinions that the ALJ relied upon, and in light of these gaps in the record, the Court is unable to conclude that substantial evidence supported the ALJ's decision to confer greater weight on the opinions of Drs. Kuslis and Khan than on that of Dr. Parrillo.

The ALJ is therefore instructed on remand to further develop the record by making reasonable efforts to obtain updated opinions from Drs. Kuslis and Khan or another medical source that account for the Plaintiff's entire medical history and that consider the opinion of Dr. Parrillo. *See Jazina*, 2017 WL 6453400, at *7 (ordering remand after determining that "[t]he ALJ erred in

assigning significant weight to the state agency medical consultants' under-informed opinions" where they failed to review the entire record and did not consider the opinions of the plaintiff's treating physicians, and further noting that "[t]he ALJ may also decide to request an updated assessment from a state agency medical consultant, after the consultant has the opportunity to review all of the information in the record, including the treating physicians' opinions"); *see also McGlothin v. Berryhill*, No. 1:17-CV-00776 (MAT), 2019 WL 1499140, at *4–*5 (W.D.N.Y. Apr. 4, 2019) (ordering ALJ on remand "to obtain an updated opinion from a consultative physician or other acceptable medical source regarding all of Plaintiff's exertional and postural limitations" where the Court determined that the consultative physician's opinion was stale for failing to account for the Plaintiff's entire medical history).

### Dr. Parrillo

As for Dr. Parrillo, the ALJ conferred only "partial weight" on his opinion in assessing the Plaintiff's RFC. (Tr. 21.) The ALJ acknowledged that Dr. Parrillo is a "treating source" but declined to afford his opinions controlling weight due to the ALJ's conclusion that "the opined limitations in the claimant's ability to tolerate prolonged sitting, required use of a cane for ambulation, and inability to perform postural activities is inconsistent with Dr. Parillo's [sic] own findings on physical and neurological examination, showing general benign findings and full strength in the claimant's lower extremities." (*Id.*)

"An ALJ acts reasonably . . . in discounting a treating physician's opinion based on a finding that the opinion was inconsistent with the physician's own treatment notes." *Harrison v. Berryhill*, No. 16-CV-7220 (KMK), 2019 WL 580748, at *8 (S.D.N.Y. Feb. 13, 2019). The ALJ's characterization of Dr. Parrillo's medical statement as being inconsistent with his own treatment observations is supported by substantial evidence in the record. (*See* Tr. 749 (reporting "full and

functional" range of motion in "flexion and extension," negative straight leg raising, negative "[f]acet loading maneuvers involving standing extension and rotation," "symmetric and equal" deep tendon reflexes, "5/5 strength throughout both upper and lower extremities," and a normal gait "without assistive device," though observing "tenderness in the paraspinals, quadratus, and superior cluneal region"); Tr. 763 (same); Tr. 787 (same); Tr. 795 (same); Tr. 802 (observing "sensory loss and muscle weakness in the lower extremities" but full range of motion, "no gross deformity or atrophy," "[m]otor testing is 5/5 in all extremities," normal gait, and symmetric and equal deep tendon reflexes).)

However, certain evidence from Plaintiff's other treatment providers supports Dr. Parrillo's opinion. (*See, e.g.*, Tr. 584 (note from physical therapist Pastuszak approximately one month before Plaintiff's fusion surgery describing Plaintiff's significant physical limitations); Tr. 682 (physical therapy note approximately three months after Plaintiff's fusion surgery indicating progress but recommending ongoing "skilled PT to address ROM [range of motion] and strength limitations"); Tr. 809 (note from Dr. Aferzon approximately five months after Plaintiff's fusion surgery indicating that Plaintiff "is slowly improving" but "[s]till very limited in physical activity" and "reports some neurogenic symptoms"); Tr. 882 (report from Dr. Bash in January 2016 indicating that Plaintiff has a "significant bilateral paralumbar muscle spasm, "[n]o pathologic reflexes," and "a significantly antalgic gait").) And while the ALJ also found Dr. Parrillo's opinion to be inconsistent with the Plaintiff's own testimony concerning his ability to perform daily activities (Tr. 21), some of the Plaintiff's testimony corroborates the limitations described by Dr. Parrillo. For example, while the Plaintiff testified that he manages his own physical therapy daily, is able to shower, do light loads of laundry, prepare meals for his family, and attend car shows once or twice a year, he also testified that: he uses a cane daily (Tr. 46); if he attends a car show

he can only walk for 45 minutes to an hour before needing a wheelchair (*id.*); he typically rests "for a couple of hours" each day after completing an hour to an hour and 15 minutes of physical therapy (Tr. 48–49); he needs assistance obtaining heavy items from the kitchen when cooking and is unable to reach for items that are on the bottom shelves (Tr. 50); he experiences spasms in his leg and back "every single day constantly" (Tr. 54); he frequently changes positions and lies down typically once an hour or every other hour (Tr. 55–56); and about every other hour of each day the pain will disrupt everything that he is doing, and that on some days this will occur nearly every 30 minutes to an hour. (Tr. 58.) While the ALJ was entitled to weigh the Plaintiff's credibility, *see, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999), the Court does not find the Plaintiff's testimony so inconsistent with Dr. Parrillo's opinion so as to warrant discounting Dr. Parrillo's opinion on that basis alone.

In short, because the ALJ did not address fully "the consistency of [Dr. Parrillo's] opinion with the remaining medical evidence," *Consiglio*, 2018 WL 1046315, at *4 (quoting *Greek*, 802 F.3d at 375), on remand the ALJ should revisit the weight to be afforded to Dr. Parrillo's opinion alongside his reconsideration of updated opinion evidence from Drs. Kuslis and Khan or other acceptable medical source(s).

### Whether Plaintiff's RFC is Otherwise Supported by the Record

Finally, Plaintiff argues that the limitations identified by Dr. Parrillo were wrongfully excluded from Plaintiff's RFC. At his hearing the Vocational Expert testified that if Plaintiff's need to change positions resulted in him being 10% or more off task per day, it "would then rule out all competitive employment." (Tr. 65.) The Vocational Expert further answered in the affirmative when asked, "if someone were unable to sit or stand in combination for a full eight hours would that preclude full time work?" (*Id.*) Because Dr. Parrillo opined that Plaintiff would

be off-task at least 25% of the day and could stand and sit in combination for no more than four hours per day, Plaintiff argues that crediting his opinion would have precluded a finding that Plaintiff has the ability to perform sustained work for eight hours a day.

This argument is essentially a repackaging of Plaintiff's argument that the ALJ erred in failing to give adequate weight to Dr. Parrillo under the treating physician rule. For the reasons previously stated, on remand the ALJ should revisit the extent to which Dr. Parrillo's opined limitations are consistent with the other medical evidence in the record in determining whether to credit these limitations.

**Conclusion**

For the foregoing reasons, Plaintiff's motion to remand is granted and the Commissioner's motion for judgment on the pleadings is denied. The Clerk shall enter a judgment of reversal and remand the case to the Commissioner for further proceedings consistent with this Memorandum of Decision. Specifically, the ALJ shall reconsider the Plaintiff's RFC for purposes of the disability determination both for a closed period and generally. The ALJ shall further develop the record by seeking updated opinions from Drs. Kuslis and Khan or other suitable medical source(s) that account for the Plaintiff's entire medical history and that consider the opinion of Dr. Parrillo. In light of the updated record, the ALJ shall revisit and reconcile his prior findings and determine anew whether the Plaintiff was disabled for a closed period or is currently disabled under the Act. Any subsequent appeal to this Court from the Commissioner's decision following remand shall be assigned to me, as the District Judge who issued the ruling that remanded the case.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of February 2020.

 */s/ Kari A. Dooley*  
KARI A. DOOLEY  
UNITED STATES DISTRICT JUDGE